UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SOULEYMANE YACOUBA-ISSA,     *
     *
    Petitioner,     *
     *        No. 16-cv-12124-ADB
    v.     *
     *
DANIEL CALIS, JR.,     *
     *
    Respondent.     *
     *

**MEMORANDUM AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS**

BURROUGHS, D.J.

On September 1, 2011, following a jury trial in Middlesex Superior Court, Petitioner Souleymane Yacouba-Issa ("Petitioner" or "Mr. Yacouba-Issa") was convicted of murder in the first degree on a theory of deliberate premeditation, in violation of Mass. Gen. Laws ch. 265, § 1. Petitioner was sentenced to life in prison.

Before the Court is Mr. Yacouba-Issa's petition (the "Petition") for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. [ECF No. 1]. The Petition raises six grounds for relief: (1) the trial court violated Petitioner's right to an impartial jury free from discrimination ("Ground One"); (2) the trial violated Petitioner's rights to due process and a fair trial when the trial court imposed unreasonable and prejudicial sanctions ("Ground Two"); (3) Petitioner was denied effective assistance of counsel and a fair trial because his counsel's conduct resulted in prejudicial sanctions at trial ("Ground Three"); (4) Petitioner was denied effective assistance of counsel and a fair trial because his counsel failed to challenge the scientific reliability of DNA test results ("Ground Four"); (5) Petitioner was denied effective assistance of counsel and fair trial after his counsel failed to object to the prosecutor's statements about and characterization of

DNA evidence during trial ("Ground Five"); and (6) Petitioner was denied effective assistance of appellate counsel when his appellate counsel failed to raise the claims under Grounds Three, Four, and Five on direct appeal ("Ground Six"). [ECF Nos. 1, 1-2]. For the reasons stated herein, the Petition is DENIED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In Commonwealth v. Issa, 992 N.E.2d 336 (Mass. 2013), the Massachusetts Supreme Judicial Court ("SJC") described the facts of this case, which this Court now "supplement[s] with other record facts consistent with the SJC's findings." Yeboah–Sefah v. Ficco, 556 F.3d 53, 62 (1st Cir. 2009) (quoting Healy v. Spencer, 453 F.3d 21, 22 (1st Cir. 2006)).[1]

The SJC stated the following facts relevant to Petitioner's grounds for habeas relief:

[Petitioner] and the victim had dated, lived together, and parented a daughter, who was born in 2005. . . In March, 2009, they no longer lived together, but [Petitioner] often visited and stayed overnight at the victim's home in Waltham, where she lived with her eighteen year old son and three and one-half year old daughter. In the months leading up to her death, the victim and [Petitioner] had been planning to initiate a cleaning business. [Petitioner] lived in Taunton and, unbeknownst to the victim's family, had married and was living with his wife, Susan Dubuc . . . .

On the evening of March 20, 2009, [Petitioner] visited the victim for three hours at her home, where they tested cleaning products. On March 21, a sister of the victim (Guile Sautier) and her family visited the victim at her home, and remained there from approximately 4:30 p.m. to 8:30 p.m. At approximately 10:15 p.m., the victim telephoned her teenage son and asked him to come home to take care of his sister because she had to "meet him at a site"; her son understood her to mean that she was going to meet [Petitioner] at a cleaning site. Her son returned home around 10:30 p.m., and the victim soon left. At approximately 10:50 p.m., the victim telephoned her son and asked if he wanted her to bring him something to eat. The victim did not return home the next morning and did not answer her son's telephone calls, so the son contacted the victim's two sisters and [Petitioner]. [Petitioner] told the son that he had not spoken with the victim since 6:30 p.m. on March 21, and that he had not met with her that evening.

---

[1] In a habeas case, state court "factual findings are entitled to a presumption of correctness that can be rebutted only by clear and convincing evidence to the contrary." Rashad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002) (internal quotations omitted).

The victim often visited another sister, Yves Nelson, who lived nearby in Waltham. The victim had keys to Nelson's apartment. Nelson had stayed overnight with relatives on March 21 and returned home to her apartment at approximately 4 p.m. on March 22. After unlocking the apartment door, she found the victim lying on the living room floor, apparently lifeless, and telephoned 911.[2] The victim's pants had been pulled down, there were bleach stains on her jacket and on the rug near her body, a capped needle from a syringe was on the floor a few feet from her body, and a small piece of dark blue string was next to her shoulder. The victim showed signs of rigor mortis, and was later declared dead.

At the crime scene, apart from the piece of dark blue string on the floor next to the victim's shoulder, investigators observed a brown mark around the victim's neck, a tiny piece of string embedded in her neck, and a piece of dark blue string around the right side of her neck. A medical examiner opined that the victim's death was caused by strangulation by ligature. A swab taken from the broken string found near the victim's right shoulder was submitted for Y-chromosome short tandem repeat (Y–STR) deoxyribonucleic acid (DNA) testing, which looks only at DNA from the Y-chromosome, found only in males, and compares the questioned DNA profile, not with a particular individual's DNA profile, but with the DNA profile of the paternal lineage of a family.[3] The Y–STR DNA testing revealed that [Petitioner]'s paternal lineage was a potential contributor of the DNA profile taken from the string; the probability of inclusion was one in 1,156 in the African-American population, which meant that the DNA on the Y-chromosome of 99.91 per cent of African-American men would not match the DNA profile from the string.[4]

The police also removed a gummy substance that covered the peephole on the door leading into Nelson's apartment. Short tandem repeat (STR) DNA testing was conducted of a swab taken from that substance, and [Petitioner's] DNA was found to be a potential contributor to the DNA from that swab. The probability that a randomly selected individual would have that DNA profile was one in 66.23 quadrillion for the African-American population.

[Petitioner] stipulated at trial that the white residue on a capped needle from a syringe found near the body was acetaminophen and codeine. Toxicological testing

[2] In footnote four the SJC stated, "There were no signs of forced entry into the apartment."

[3] In footnote five the SJC stated, "In other words, [Petitioner]'s profile resulting from Y-chromosome short tandem repeat (Y–STR) deoxyribonucleic acid (DNA) testing is identical to the profile of his brothers, their father, and their forefathers. One of the [Petitioner]'s brothers, Issoufou Yacouba-Issa, resided in Massachusetts at the time of the killing and had visited the apartment where the victim's body was found in March of 2009, but denied any connection to the tested string."

[4] In footnote six the SJC stated, "DNA testing was also conducted of a swab taken from the fingernails of the victim, which revealed a DNA mixture from at least two individuals. One of the DNA profiles matched [Petitioner]'s paternal lineage. The probability of inclusion was one in fourteen for the African-American population."

performed by the Commonwealth revealed that neither drug was present in the victim's body. [Petitioner] worked in a quality control laboratory where he had access to an area that required a special pass for admittance where capped needles of the same size and type were stored in an unlocked drawer.

Waltham police Detective Lieutenant Brian Navin and Detective Patrick Hart arrived at Nelson's apartment at 5:40 p.m. but were soon summoned back to the police station after being told that the victim's former boy friend ([Petitioner]) had arrived at the station. Navin and Hart spoke with [Petitioner] in an upstairs room at the station for approximately thirty minutes; the interview was not recorded. The interview began with [Petitioner] answering the detectives' questions about the victim's physical and mental health, which they asked because they did not yet know what caused the victim's death. [Petitioner] described his whereabouts on the previous day. He said that he had gone to Nelson's apartment at 6:30 p.m. on March 21 to pick up his daughter (who was not there), and met with the victim for approximately one-half hour. He said that the victim had invited him inside the apartment, but he remained in the entryway. He said that he then went to the victim's apartment in search of his daughter, but nobody was home, so he left. He said he then drove to pick up Dubuc, who was waiting for him at a pharmacy in Waltham, and went with her first to a restaurant in Waltham and then to a department store in Waltham. He said he then left Dubuc at a tavern in Waltham at approximately 9 p.m., drove back to the victim's apartment (and found no one home), drove to a brother's residence in Waltham to pick up mail, returned to the tavern, and drove home with Dubuc to Taunton.

Other evidence contradicted the time line given by [Petitioner] concerning his whereabouts on March 21. He told the police that he spent time with the victim at Nelson's apartment at 6:30 p.m., but the victim was at her home with Sautier and her family from approximately 4:30 p.m. to 8:30 p.m., and had stepped out for only a few minutes to retrieve a pair of pliers from her vehicle. Independent evidence corroborated that [Petitioner] had left Dubuc at a tavern in Waltham at approximately 9 p.m., but, although Dubuc had stepped out of the tavern and returned, she did not finally depart until approximately 11:40 p.m., which is substantially later than the time necessary for [Petitioner] to have left the tavern, gone to the victim's apartment to find no one home, pick up mail at his brother's home in Waltham, and return to the tavern to pick up Dubuc. Cellular telephone records revealed that Dubuc repeatedly telephoned [Petitioner] between 9:46 p.m. and 11:40 p.m., but there is no record of his receipt of these calls or the location of his telephone during this time period, which suggests that [Petitioner]'s telephone was turned off or without battery power during this time period. The next call involving the [Petitioner]'s telephone occurred at 12:39 a.m. on March 22, at which point the telephone was located in the Taunton area.[5] The discrepancy in this time line is critical because, according to cellular telephone records, the victim was alive

_____

[5] In footnote seven the SJC stated, "Susan Dubuc testified that [Petitioner], using a charger, telephoned her when they returned home to enable her to locate her cellular telephone."

at 10:54 p.m. on March 21, when she made her last telephone call, which was to Nelson.[6]

[Petitioner] was indicted by a grand jury in May, 2009, on a charge of murder in the first degree and a charge of stalking, in violation of G.L. c. 265, § 43 (a ). On November 12, 2010, a jury convicted [Petitioner] of stalking but could not reach a verdict on the murder indictment. He was retried on the murder indictment in August, 2011, and convicted. The jury at the second trial did not learn that [Petitioner] had been convicted of stalking the victim.

Issa, 992 N.E.2d at 340–43.

The day after Petitioner was convicted of murder, the trial judge sentenced Petitioner to

life in prison. [ECF No. 26 at 9–10]. Petitioner appealed to the SJC arguing that:

(1) he was denied his state and federal constitutional rights to equal protection, a fair trial and an impartial jury by the prosecutor's use of a peremptory challenge to remove the only black male venire member; (2) he was denied his state and federal constitutional rights to due process and a fair trial by the trial court's cascading sanctions based on the finding that trial counsel had violated the reciprocal discovery obligations concerning the pants and jacket depicted in the TJ Maxx surveillance video; (3) the trial court erred by not giving a DiGiambattista instruction[7] and thus denied the petitioner a fair trial; (4) the prosecutor's closing argument was improper in many important respects and violated the petitioner's rights to due process and a fair trial; and (5) the trial judge violated the petitioner's constitutional rights to due process and a fair trial by failing to give his theory-of-defense instruction.

[Id. at 10]. The SJC rejected Petitioner's appeal and affirmed his murder conviction. [Id.].

---

[6] In footnote eight the SJC stated, "The medical examiner was unable to ascertain from the condition of the body the time of death beyond concluding that it occurred more than twenty-four hours before the autopsy, which was conducted at 1 p.m. on March 23. The [Petitioner] argued that the victim died after 4:30 a.m. on March 22, because rigor mortis was observed when her body was discovered."

[7] See Commonwealth v. DiGiambattista, 813 N.E.2d 516, 533–34 (Mass. 2004) (holding that when the prosecution introduces evidence of a defendant's custodial confession and there is not an audio recording of the complete interrogation, upon request, the defendant is entitled to a cautionary instruction "that the State's highest court has expressed a preference that such interrogations be recorded," and the jury should weigh "the evidence of the defendant's alleged statement with great caution and care").

On October 6, 2014, Petitioner filed a motion for new trial in Middlesex Superior Court. [Id.]. In his motion, Petitioner argued that his counsel provided ineffective assistance in several ways:

> by violating a discovery order and "ambushing" the prosecution by introducing into evidence the clothing which [Petitioner] had allegedly worn on the night of the murder; by not challenging the admissibility of evidence concerning DNA found on a drawstring and fingernail clippings; by not objecting to mischaracterizations of the DNA evidence by the prosecutor's DNA expert and by the prosecutor herself; by the combined effect of his trial counsel's errors and omissions; and by his appellate counsel's failure to raise the ineffectiveness of his trial counsel as part of the appeal from his conviction.

[ECF No. 1-3 at 1]. On June 7, 2016, the motion judge, who was also the trial judge, denied the motion for new trial stating, *inter alia*, that the issues raised by Petitioner did not constitute ineffective assistance of trial counsel; thus, appellate counsel was not ineffective for not raising the claims on appeal. [Id. at 1–12].

On July 1, 2016, Petitioner sought leave from the SJC to appeal the trial court's denial of his motion for new trial. [ECF No. 26 at 12]. On October 17, 2016, the SJC denied leave to appeal pursuant to the gatekeeper provision of Mass. Gen. Laws ch. 278, § 33E. [ECF No. 1-4].

On October 21, 2016, Petitioner filed the instant Petition pursuant to 28 U.S.C. § 2254 raising the six grounds stated above. [ECF No. 1, 1-2]. Daniel Calis, Jr. ("Respondent") answered the petition on December 21, 2016. See [ECF No. 11]. Petitioner filed his Memorandum in Support of the Petition on March 30, 2017, [ECF No. 25], Respondent filed his Memorandum in Opposition to the Petition on May 31, 2017, [ECF No. 26], and Petitioner filed his Reply on June 29, 2017, [ECF No. 27].

## II.    LEGAL STANDARD

A federal district court's review of a state criminal conviction is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"). See 28 U.S.C. § 2254.

The AEDPA permits federal courts to grant habeas relief after a final state adjudication of a federal constitutional claim only if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently from a decision of the Supreme Court on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. 362, 412–13 (2000). A state court decision is considered an unreasonable application of Supreme Court precedent if the state court identifies the correct legal rule but unreasonably applies it to the facts. Id. at 407–08. An unreasonable application requires "some increment of incorrectness beyond error." Norton v. Spencer, 351 F.3d 1, 8 (1st Cir. 2003) (internal quotation marks omitted).

A state court judgment is based on an unreasonable determination of the facts if the decision is "objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). "The petitioner carries the burden of proof." Cullen v. Pinholster, 563 U.S. 170, 181 (2011). In conducting a habeas review, a federal court is limited to deciding whether the conviction violated the Constitution, laws, or treaties of the United States. Estelle v. McGuire, 502 U.S. 62, 68 (1991). Furthermore, "[e]rrors based on violations of state law are not within the reach of federal habeas petitions unless there is a federal constitutional claim raised." Kater v. Maloney, 459 F.3d 56, 61 (1st Cir. 2006).

A federal court cannot grant habeas relief to a state prisoner unless the prisoner has first exhausted his federal constitutional claims in state court. 28 U.S.C. § 2254(b)(1)(A). "[T]he

state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). A claim for habeas relief is exhausted if it has been "fairly and recognizably" presented in state court. Sanchez v. Roden, 753 F.3d 279, 294 (1st Cir. 2014) (quoting Casella v. Clemons, 207 F.3d 18, 20 (1st Cir. 2000)). In other words, "a petitioner must have tendered his federal claim [in state court] in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question." Id. (internal quotation marks and citations omitted).

"[A] state court decision that does not address the federal claim on the merits falls beyond the ambit of AEDPA. When presented with such unadjudicated claims, the habeas court reviews them de novo." Clements v. Clarke, 592 F.3d 45, 52 (1st Cir. 2010). Yet, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 562 U.S. 86, 99 (2011).

## III. DISCUSSION

### a. Ground One: Right to Impartial Jury

In Ground One of the Petition, Petitioner claims that his "14th Amendment rights under [the] U.S. Const[itution] guaranteeing equal protection and right to select an impartial jury free from discrimination were violated by the state court." [ECF No. 1 at 6]. At trial, Petitioner's trial counsel objected to the prosecution's use of a peremptory challenge of an African-American male juror, and trial counsel noted that "this was the only African American male in the entire venire during the selection process." [ECF No. 25 at 19]. The trial court found that there was no

pattern of discrimination in the prosecutor's peremptory challenges to satisfy the prima facie burden in Batson's first step, noting that an African female juror had been selected, and allowed the exercise of the prosecutor's peremptory challenge. [Respondent's Supplemental Answer Vol. II:5 at 192]; see Batson v. Kentucky, 476 U.S. 79, 96 (1986). Petitioner argues that the SJC's failure to reverse based on the use of a peremptory challenge to exclude the only African-American male juror in the venire was an unreasonable application of clearly established Federal law in light of Batson. [ECF No. 1-2 at 1].

### 1. Legal Standard under Batson

"The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" Foster v. Chatman, 136 S. Ct. 1737, 1747 (2016) (quoting Snyder v. Louisiana, 552 U.S. 472, 478 (2008)). In Batson, the Supreme Court provided a three-step process for determining when a strike is discriminatory. As the Supreme Court later articulated in Snyder v. Louisiana:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

552 U.S. at 476–77 (internal quotation marks and brackets omitted).

To establish a prima facie case of discrimination under Batson, "the moving party must 'raise an inference that the prosecutor used [peremptory challenges] to exclude the veniremen from the petit jury' because of their membership in a protected class." Aspen v. Bissonnette, 480 F.3d 571, 574 (1st Cir. 2007) (alteration in original) (quoting Batson, 476 U.S. at 96). "An inference is generally understood to be a conclusion reached by considering other facts and deducing a logical consequence from them." Johnson v. California, 545 U.S. 162, 168 n.4

(2005) (internal quotation marks omitted).  The party challenging the strike bears the burden of proof.  United States v. Girouard, 521 F.3d 110, 113 (1st Cir. 2008).

"While the prima facie case requirement is not onerous, neither can it be taken for granted."  United States v. Bergodere, 40 F.3d 512, 516 (1st Cir. 1994).  "[A] defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."  Aspen, 480 F.3d at 575 (quoting Johnson, 545 U.S. at 170).  In evaluating whether a defendant has satisfied the prima facie burden under step one, a trial court is required to "consider all relevant circumstances," including, but not limited to, a "prosecutor's questions and statements during voir dire examination and in exercising his challenges," and whether there is "a 'pattern' of strikes against black jurors."  Sanchez, 753 F.3d at 291 (quoting Batson, 476 U.S. at 97).  The trial court may also take into account "whether similarly situated jurors from outside the allegedly targeted group were permitted to serve" on the jury.  Aspen, 480 F.3d at 577.

The second prong of Batson is "reached only if the first [prong] is satisfied."  Scott v. Gelb, 810 F.3d 94, 100 (1st Cir. 2016).  "Ultimately, it is up to the trial judge to determine whether the relevant circumstances in any particular case are sufficient to make out a prima facie case of discrimination," and satisfy the first prong of Batson.  Sanchez, 753 F.3d at 291.

### 2.  SJC Decision

"Recognizing it to be a close question," the SJC rejected Petitioner's Batson claim, stating that it was within the trial judge's discretion to find no pattern of discriminatory challenges.  Issa, 992 N.E.2d at 345–46.  In discussing Batson's first prong, the SJC recognized that although Petitioner had showed "that the prosecutor had challenged the only African-American male remaining in the venire," id. at 345, "the judge was entitled also to consider

'other relevant circumstances' available to him in deciding whether [Petitioner] adequately rebutted the presumption that the prosecutor made a proper challenge," id. (quoting Batson, 476 U.S. at 96).

The SJC determined that the trial judge primarily relied on three relevant circumstances when considering Batson's first prong: (1) a female juror who had been born in Africa was seated as a juror which suggested the prosecutor did not hold a bias against African-Americans who were born in Africa;[8] (2) both Petitioner and the victim were African-American, so any inference of bias in jury selection arising from an interracial killing was not warranted; and (3) the prosecutor had informed the judge that the prospective juror "look[ed] very familiar" and that she was "trying to place him" which entitled the judge to infer that there was a risk that the juror, if seated, may have needed to be excused from the jury panel once the prosecutor placed him. Id. at 345–46. "In view of these circumstances, which diminished the likelihood that the reason for the prosecutor's challenge to the only African-American male in the venire was solely the prospective juror's race and gender," the SJC concluded "that the judge did not abuse his discretion in finding that [Petitioner] had fallen short of making a prima facie case of bias." Id. at 346.[9]

### 3. Analysis

Determining whether the moving party has made out a prima facie case of discrimination requires an evaluation of "all relevant circumstances." Gray v. Brady, 592 F.3d 296, 303 (1st Cir. 2010) (quoting Batson, 476 U.S. at 96). These relevant circumstances include the

---

[8] The SJC noted that "[a]lthough we recognize that one can be Caucasian and still be born in Kenya, we think it likely from her African surname that she is a black African-American." Issa, 992 N.E.2d at 345 n.11.

[9] In footnote fourteen, the SJC stated that, while it found no abuse of discretion, the trial judge "created a significant and needless risk of reversal by failing to require the prosecutor to explain her reasons." Issa, 992 N.E.2d at 346 n.14.

"prosecutor's questions and statements during voir dire examination and in exercising his challenges," "the presence of an alternative, race-neutral explanation for the strike," and "whether similarly situated jurors from outside the allegedly targeted group were permitted to serve." Sanchez, 753 F.3d at 291, 302. "Ultimately, it is up to the trial judge to determine whether the relevant circumstances in any particular case are sufficient to make out a prima facie case of discrimination." Id. at 291.

In the instant case, the trial judge determined that there was not a pattern of discriminatory strikes by the prosecutor sufficient to satisfy Batson's first step, and, after evaluating all relevant circumstances, the SJC affirmed this decision. Issa, 992 N.E.2d at 346. Petitioner asserts that "[t]he SJC's factual findings are clearly erroneous." [ECF No. 25 at 21]. His sole factual assertion in support of his objection at trial was that the challenged juror was the "only potential black male juror" in the venire. [ECF No. 25 at 20]; see also [ECF No. 27, 35]. While the SJC has affirmed that the strike of one juror can constitute a pattern that satisfies Batson's first step, Issa, 992 N.E.2d at 343–44, "[a] defendant who advances a Batson argument ordinarily should come forward with facts, not just numbers alone," Bergodere, 40 F.3d at 516 (internal quotation marks omitted). Petitioner made no factual claims of inappropriate discriminatory statements from the judge or prosecutor during voir dire or the seating of similarly situated non-African-American jurors or any other claims beyond the fact that the prosecutor struck the one black male. See [ECF Nos. 1, 25, 27, 35].

A court, in considering whether the prima facie burden of Batson's first step has been met "must consider other factors," beyond mere numbers, including "as the capstone, the presence of an alternative, race-neutral explanation for the strike." Scott, 810 F.3d at 101 (internal quotation marks omitted). The SJC properly considered other factors including the racial makeup of the

empaneled jury, evidence of racial animus in the case, and possible race-neutral reasons for the strike. See Issa, 992 N.E.2d at 346. The factual findings on these issues by the SJC are supported by the record, and the Court does not find them to be clearly erroneous.

Petitioner also argues that "[t]he SJC's . . . legal conclusions are contrary and an unreasonable application of federal law." [ECF No. 25 at 21]. To support this claim, Petitioner argues that the SJC's evaluation of multiple factors, including the prosecutor's statements and the lack of racial animus in the case, "reeks of afterthought." [ECF No. 25 at 21 (quoting Foster, 136 S. Ct. at 1755)]. The Court disagrees. In evaluating all relevant factors, the SJC complied with applicable precedent. Cf. Batson, 476 U.S. at 97; Sanchez, 753 F.3d at 291; Scott, 810 F.3d at 101.

Petitioner analogizes his case to Sanchez v. Roden, 753 F.3d 279 (1st Cir. 2014), in which the First Circuit found that a Massachusetts court had erred in finding no pattern of discrimination when a prosecutor used a peremptory challenge on an African-American juror after other African-American jurors had already been seated on the panel. See [ECF No. 25 at 22–24]. Petitioner's case is distinguishable from Sanchez where the First Circuit's reasoning was based, in large part, on the seating of non-African-American jurors who were similarly situated to the challenged African-American juror, but for their race. See Sanchez, 753 F.3d at 303–07. Petitioner has made no substantial argument in his complaint or briefs that jurors were seated who were similarly situated to the challenged juror at issue. See [ECF Nos. 1, 25, 27, 35]. See also Scott, 810 F.3d at 102–03 (affirming SJC's decision to defer to trial judge's determination that Batson's first step had not been met and distinguishing Sanchez from Scott's case because of "Scott's failure to offer additional evidence supporting the inference of racial

discrimination" beyond numbers and because of the SJC's consideration of other "available information bearing on whether an inference of racial discrimination had been raised").

The First Circuit has made it clear that, "the mere fact that the prosecutor challenges the only [male] juror of a particular race, without more, does not automatically give rise to an inescapable inference of discriminatory intent." Bergodere, 40 F.3d at 516. While Petitioner argues the numbers alone were enough to satisfy Batson's first step, "the numbers here, particularly in the absence of circumstances suggesting juror bias, judge insensitivity, or improper motive by the state prosecutor, were not so blatant as to compel the judge to make such a finding." Brewer v. Marshall, 119 F.3d 993, 1005 (1st Cir. 1997). The SJC's deference to the trial judge in this case was not an unreasonable application of federal law.

Thus, because the court does not find the SJC's factual findings to be erroneous or its legal conclusions to be an unreasonable application of federal law, Petitioner is not entitled to relief on Ground One.

### b. Ground Two: Sanctions

In Ground Two, Petitioner claims that he "was denied due process and a fair trial in violation of this 5th and 14th Amendment rights when the trial court imposed unreasonable and prejudicial sanctions on the defendant at trial." [ECF No. 1 at 7]. At trial, Petitioner's counsel violated a reciprocal discovery order by failing to give the Commonwealth notice that he had clothing Petitioner allegedly wore at the time of the murder and producing it, with notification to neither the prosecutor nor the court, while cross-examining a witness. [ECF No. 25 at 14]. Petitioner's counsel informed the court that he intended to offer the clothing into evidence through Petitioner's wife, Ms. Dubuc. Issa, 992 N.E.2d at 348. The trial court found that Petitioner's counsel had acted in bad faith and that his conduct regarding the disclosure was

"egregious." Id. The trial judge allowed the clothing to be admitted, but imposed sanctions to minimize the prejudice suffered by the prosecution due to the violation of the discovery order by the defense. Id. at 348–49. Petitioner argues that, because it is likely that the jury would have acquitted Petitioner but for the "unfairly prejudicial sanctions," the SJC's "affirmance of his conviction was contrary to and an unreasonable application of federal constitutional principles." [ECF No. 1-2 at 2].

### 1. Legal Standard

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Clark v. Arizona, 548 U.S. 735, 789 (2006) (quoting Holmes v. South Carolina, 547 U.S. 319, 324 (2006)). However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." United States v. Scheffer, 523 U.S. 303, 308 (1998) (citing Taylor v. Illinois, 484 U.S. 400, 410 (1988); Rock v. Arkansas, 483 U.S. 44, 55 (1987); Chambers v. Mississippi, 410 U.S. 284, 295 (1973)). "A defendant's interest in presenting such evidence may thus 'bow to accommodate other legitimate interests in the criminal trial process.'" Id. (quoting Rock, 483 U.S. at 55).

"Procedural rules mandating pretrial disclosure . . . are at the core of the public interest." Chappee v. Vose, 843 F.2d 25, 28 (1st Cir. 1988). It follows, then, that an accused's right to present a defense may be limited where he has failed to comply with relevant requirements of pretrial discovery. Id. The limitation or exclusion of evidence by a state court is constitutional so long as a defendant still has "an adequate opportunity" to challenge the case against him. Dolinger v. Hall, 302 F.3d 5, 11 (1st Cir. 2002); see Brown v. Ruane, 630 F.3d 62, 72–74 (1st

Cir. 2011) (holding that trial court's hearsay rulings limiting defendant's cross examination of prosecution witnesses did not violate defendant's constitutional rights because defendant had adequate opportunity to present his theory of the case).

### 2. SJC Decision

The SJC rejected Petitioner's claim that he was denied due process and a fair trial as a result of the trial judge's sanctions. See Issa, 992 N.E.2d at 351. In evaluating the sanctions, the SJC first noted that neither party disputed that there was a discovery violation. Id. at 349. The SJC concluded that Petitioner had violated the discovery order to gain a tactical advantage by allowing the prosecution to develop their theory of the case around the missing clothes, only to reveal the clothes and counter the prosecution after they were committed to the theory. Id. at 349–50. The SJC held that the trial judge had broad discretion to find prejudice and was "entitled to credit the prosecutor's representation that, had she known of the existence of this evidence," she would have presented the case differently. Id.

The SJC determined that, because the trial judge found that the discovery violation caused prejudice, the judge was entitled to order sanctions that were "remedial in nature" and "tailored appropriately to cure any prejudice resulting from a party's noncompliance and to ensure a fair trial. Id. at 350 (quoting Commonwealth v. Carney, 938 N.E.2d 866, 874 (Mass. 2010)). The trial judge rejected the prosecution's desired sanction of exclusion of the jacket and pants, but allowed the prosecutor to challenge the authenticity of the clothing by instructing the jury that there had been a prior trial and permitting questioning of Ms. Dubuc as to why she had not handed over the clothing supposedly exculpatory clothing for that trial. Id. at 350–51. The trial judge gave a limiting instruction that the jurors were not to speculate about the prior trial or why the case was being retried. Id. at 348–49.

The SJC concluded that after the "egregious" discovery violation by Petitioner, "the judge carefully and thoughtfully crafted a balanced remedy that allowed [Petitioner] to offer the evidence he had failed to timely disclose in accordance with the reciprocal discovery order and preserved the Commonwealth's ability effectively to challenge the credibility of Dubuc and the authenticity of the clothing." Id. at 351. Thus, the SJC found that the trial judge did not abuse his discretion in imposing the remedial sanctions. Id.

### 3. Analysis

The constitution does not bar the use of sanctions by a trial judge in response to the violation of a discovery rule or order. See Taylor, 484 U.S. at 402. "After all: The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right. The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments." Chappee, 843 F.2d at 28. When a discovery order is violated, "measures short of preclusion may be 'adequate and appropriate in most cases.'" Id. (quoting Taylor, 484 U.S. at 413).

In the instant case, the trial judge determined that the prosecution was prejudiced, and certain remedial sanctions were necessary after Petitioner violated a reciprocal discovery order. Issa, 992 N.E.2d at 350–51. The SJC affirmed this decision. Id. at 351. Petitioner contends that these sanctions "created a degree of unfairness that 'fatally infected the trial.'" [ECF No. 25 at 25 (quoting Lisenba v. California, 314 U.S. 219, 236 (1941))]. Petitioner also asserts that the SJC's decision that the sanctions were appropriate was contrary to federal law and that the SJC's findings were not supported by the trial record. [Id.]. In support of these claims, Petitioner argues that the trial judge was "skeptical" of the prosecutor's claim of prejudice and that there

was, in reality, "no prejudice whatsoever." [Id. at 26]. Petitioner concludes that the sanctions were "non-remedial," and that the SJC erred in affirming them. [Id. at 27].

The Court disagrees with Petitioner's characterization of the sanctions. Petitioner cites Lisenba v. California, 314 U.S. 219, 236 (1941), to argue that the sanctions created a degree of unfairness that "fatally infected the trial." [Id. at 25]. Yet, in Lisenba, the Supreme Court did not find fatal unfairness and held that even a decision that may be "shocking to the sensibilities of those in the courtroom" does not necessarily create such unfairness as to deny due process. 314 U.S. at 228–29. Similarly, the sanctions imposed here did not create such unfairness as to deny due process. Additionally, the sanctions were not punitive. The trial judge, in discussing the need for sanctions, noted that he was separating the manner in which Petitioner's attorney had produced the new evidence from the fact that the new evidence prejudiced the prosecution. [Respondent's Supplemental Answer Vol. IV:12 ("Vol. IV:12) at 102–03]. Rather than punish Petitioner or his counsel, the sanctions were remedial and imposed to deal with the actual prejudice suffered by the prosecution.

The Court also disagrees with petitioner that the SJC's findings that the sanctions were remedial is not supported by the trial record. The record shows that the trial judge clearly found that "the Commonwealth was prejudiced," and that the prosecution had relied on the absence of the clothing in presenting their case. [Respondent's Supplemental Answer Vol. IV:15 at 13–17]. Both the trial judge and the prosecution noted specific ways in which they believed the prosecution had been prejudiced. See [Vol. IV:12 at 102–05]. In discussing the imposition of sanctions, the trial court regularly referenced that sanctions were needed to ensure a fair trial for both Petitioner and the prosecution. See [Respondent's Supplemental Answer Vol. IV:14 at

18

193–207].  The SJC's findings that the prosecution suffered prejudice and that the sanctions were remedial in light of that prejudice is clearly supported by the record.

Because the SJC's findings are supported by the record and comport with applicable law, the Court does not find the SJC's factual findings to be erroneous or its legal conclusions to be an unreasonable application of federal law.  Petitioner is not entitled to relief on Ground Two.

### c.  Grounds Three, Four, and Five: Ineffective Assistance of Counsel

In Grounds Three, Four, and Five of the Petition, Petitioner claims that he "was denied effective assistance of counsel and a fair trial" because of his counsel's violation of the reciprocal discovery order that resulted in sanctions, and his failure to challenge the scientific reliability of DNA test results, or to object to the prosecutor's statements about and characterization of the DNA evidence during trial.  [ECF No. 1 at 8, 10; ECF No. 1-2 at 7]. Petitioner argues that, because there was a high probability that the outcome of the case would have been different but for the ineffectiveness of his counsel, the state court's decision denying Petitioner's ineffective assistance of counsel claims was contrary to and an unreasonable application of federal law.  [ECF No. 1-2 at 4, 6–7].  Respondent replies that Petitioner's claims of ineffective assistance of counsel are barred by an adequate and independent state-law ground as they were found not to be "new and substantial" per the gatekeeper provision of Mass. Gen. Laws ch. 278, § 33E.  See [ECF No. 26 at 14; ECF No. 1-4].

### 1.  Adequate and Independent State-Law Ground

As a general proposition, "federal habeas review is precluded . . . when a state court has reached its decision on the basis of an adequate and independent state-law ground."  Burks v. Dubois, 55 F.3d 712, 716 (1st Cir. 1995) (citing Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  Preclusion under adequate and independent state-law grounds includes "procedural

default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." Martinez v. Ryan, 566 U.S. 1, 9 (2012). For a state procedural rule to constitute an adequate and independent state-law ground that bars federal review, the state procedural rule must be "a nonfederal ground adequate to support the judgment and . . . firmly established and consistently followed." Id. at 9 (citing Walker v. Martin, 562 U.S. 307, 314–15 (2011); Beard v. Kindler, 558 U.S. 53, 59–60 (2009)). The "hallmarks of inadequacy that would allow [a court] to reach the merits" include a rule that is sporadically applied or irregularly put into practice. Hodge v. Mendonsa, 739 F.3d 34, 43–44 (1st Cir. 2013).

If a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. "To establish cause, there must be some objective factor external to the defense which impeded counsel's efforts to comply with the State's procedural rule." Lee v. Corsini, 777 F.3d 46, 58–59 (1st Cir. 2015) (internal quotation marks omitted). To establish prejudice, Petitioner must show that "there is a reasonable probability that . . . the result of the proceeding would have been different" had the default not occurred. Lynch v. Ficco, 438 F.3d 35, 48 (1st Cir. 2006) (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984)); see also Murray v. Carrier, 477 U.S. 478, 494 (1986) ("The habeas petitioner must show 'not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" (quoting United States v. Frady, 456 U.S. 152,

170 (1982))). To demonstrate that a failure to consider his claims will result in a fundamental miscarriage of justice, Petitioner must make "a showing of actual innocence." Lee, 777 F.3d at 62.

### 2. Analysis

Respondent asserts that the rejection of Petitioner's grounds for ineffective assistance of counsel under the gatekeeper provision of Mass. Gen. Laws ch. 278, § 33E precludes the Court from reviewing the merits of those grounds. [ECF No. 26 at 14–15]. The First Circuit has held that "[t]he 'particular waiver rule' expressed in Massachusetts's § 33E procedure for gatekeeper review merits 'separate categorical treatment' as an independent and adequate state ground." Costa v. Hall, 673 F.3d 16, 23 (1st Cir. 2012) (quoting Mendes v. Brady, 656 F.3d 126, 129 (1st Cir. 2011)). "A Single Justice's finding that a petitioner has not raised a 'new-and-substantial' question for further review constitutes a finding of procedural default under state law." Id. (citing Mendes, 656 F.3d at 131). However, "it is not the case that a single justice's finding of a lack of substantiality will always bar merits review. Rather, . . . a finding of a lack of substantiality precludes review only when it is accompanied by the conclusion that the issue is also not new." Lee, 777 F.3d at 56–57. Thus, "it is only the failure to satisfy the 'new' prong of the § 33E rule that signals procedural default." Id. at 57.

"Under Massachusetts law, a claim is not 'new' within the meaning of § 33E 'where it has already been addressed, or where it could have been addressed had the defendant properly raised it at trial or on direct review.'" Hart v. MCI Concord Superintendent, 36 F. Supp. 3d 186, 197 (D. Mass. 2014) (quoting Commonwealth v. Gunter, 945 N.E.2d 386, 393 (Mass. 2011)). While none of Petitioner's claims for ineffective assistance of trial counsel were raised before Petitioner's motion for a new trial, each of the claims could have been raised on direct review

because the facts underlying them were available at the time of the direct appeal. Thus, the claims are not "new" within the meaning of § 33E. See Yeboah-Sefah, 556 F.3d at 75 (holding that an ineffective assistance of counsel claim was not new under § 33E because the essential factual basis of the claim could have been raised on direct appeal).

Although, Petitioner's ineffective assistance of counsel claims were procedurally defaulted, Petitioner can still raise them if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. Petitioner argues that there was cause for the default and his claims should not be procedurally barred by the single justice's ruling where there is "confusion in the state and federal courts" as to when habeas claims should be raised. [ECF No. 25 at 40]. Petitioner also argues that this "confusion" would lead to a fundamental miscarriage of justice if his claims were procedurally defaulted. [Id. at 40–41]. To support these contentions, Petitioner cites Pina v. Maloney, in which the First Circuit declined to procedurally bar a petitioner's claim of ineffective assistance of counsel that was not raised on direct appeal because that procedural rule had not "been regularly and consistently applied by the Massachusetts courts." 565 F.3d 48, 53 (1st Cir. 2009).

However, in more recent decisions, the First Circuit has made it clear that "Pina . . . is not controlling in Section 33E cases," and that § 33E acts as an adequate and independent state bar, in part, because it is not "invoked surprisingly or unfairly." Mendes, 656 F.3d at 128, 130 (noting that Pina's holding that a rule be "regularly and consistently applied" is no longer the standard to determine adequacy of a state procedural bar, but instead a court must ask if the rule is "invoked surprisingly or unfairly"). The First Circuit has gone on to add that:

> [§ 33E] not only authorizes the court to entertain motions for new trial (as for ineffective assistance) filed with it in the first instance, but gives the parties an opportunity to put in evidence supplementing the record at trial. In a case like this one, for example, the ineffective assistance claim could have been filed along with the direct appeal, presented on the basis of an expanded record, and probably considered not on the more searching standard of professional adequacy, but simply on the likelihood of any influence on the jury's conclusion. It is this distinct standard of review, relatively lenient toward defendants, that constitutes the quid pro quo, as counsel explains it, for the relatively narrow opportunity for appellate review of any subsequent claims for collateral relief on which a defendant fails to prevail in the trial court: the gatekeeper is there to bar the way to review on the merits of any claim not new and substantial.

Id. at 129. Thus, Petitioner cannot demonstrate cause for the procedural default, and the single justice's ruling that a claim is not new under § 33E serves as an adequate and independent bar to federal habeas review. Id. at 130.

Nor can Petitioner demonstrate that there would be a "fundamental miscarriage of justice" if his defaulted claim was not heard. See Coleman, 501 U.S. at 750. The fundamental miscarriage of justice exception to procedural default is "seldom to be used, and explicitly tied to a showing of actual innocence." Burks, 55 F.3d at 717 (citing Schlup v. Delo, 513 U.S. 298, 320 (1995)). Petitioner does not raise a claim of actual innocence, so the Court does not find that Petitioner has demonstrated that there would be a fundamental miscarriage of justice if his defaulted claims were not heard.

Because Petitioner's claims for ineffective assistance of counsel were not new and were rejected by the gatekeeper pursuant to § 33E, the Court finds that Petitioner is not entitled to relief on Grounds Three, Four, and Five.[10]

---

[10] Even if Petitioner's claims were not procedurally barred, they would not entitle Petitioner to habeas relief on their merits. See infra Part III.d.2.

#### d. Ground Six: Ineffective Assistance of Appellate Counsel

In Ground Six of the Petition, Petitioner claims that he was "denied effective assistance of appellate counsel" because his appellate counsel did not raise the ineffective assistance of counsel claims in Grounds Three, Four, and Five on direct review. [ECF No. 1-2 at 9]. Petitioner argues that because there was a high probability that the outcome of the case would have been different but for the ineffectiveness of his appellate counsel, the state court's decision denying Petitioner's ineffective assistance of appellate counsel claim was contrary to and an unreasonable application of federal law. [ECF No. 1-2 at 9].

##### 1. Legal Standard

A defendant is entitled to the effective assistance of appellate counsel on their initial appeal as of right. See Evitts v. Lucey, 469 U.S. 387, 394 (1985). "[T]he proper standard for evaluating [Petitioner's] claim that appellate counsel was ineffective . . . is that enunciated in Strickland v. Washington." Smith v. Robbins, 528 U.S. 259, 285 (2000). Under Strickland v. Washington, 466 U.S. 668, 694 (1984), to establish ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient and that he was prejudiced by the deficient performance. In other words, to succeed on a claim of ineffective assistance of appellate counsel, Petitioner must establish that his "counsel's representation 'fell below an objective standard of reasonableness'" and that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Moreno-Espada v. United States, 666 F.3d 60, 64 (1st Cir. 2012) (quoting Padilla v. Kentucky, 559 U.S. 356, 366 (2010)). "[J]udicial scrutiny of counsel's performance must be highly deferential," and "a reviewing court must not lean too heavily on hindsight: a lawyer's acts and omissions must be judged on the basis of what he knew, or should have known, at the time his tactical choices were

made and implemented." Yeboah-Sefah, 556 F.3d at 70 (citing Ouber v. Guarino, 293 F.3d 19, 25 (1st Cir. 2002)).

## 2. Analysis

Petitioner argues that his appellate counsel's performance was deficient in failing to raise three separate ineffective assistance of counsel claims, and that this deficient performance prejudiced the outcome of his case. [ECF No. 1-2 at 9]. First, Petitioner asserts that his appellate counsel was ineffective by not raising a claim of ineffective assistance of counsel regarding trial counsel's use of the clothing evidence that led to the allegedly prejudicial discovery sanctions. [Id.; ECF No. 1 at 8]. The sanctions at issue, however, were not prejudicial to Petitioner, but merely used to offset the prejudice suffered by the prosecution due to the discovery order violation. See supra Part III.b; see also [ECF No. 1-4 at 3–4].

Additionally, as discussed by the trial judge, the clothing offered "a clear counter to the Commonwealth's theory of the case," and the decisions not to comply with the discovery order and to offer the clothing into evidence were strategic choices. [ECF No. 1-3 at 7]. "[S]trategic choices" by trial counsel, made after sufficient investigation, are "virtually unchallengeable." Hinton v. Alabama, 571 U.S. 263, 274 (2014). When considering an attorney's strategic choices, a reviewing court must be highly deferential to the attorney. Yeboah-Sefah, 556 F.3d at 70 (citing Ouber, 293 F.3d at 25). Here, under this standard, the trial attorney's strategic choices were not objectively unreasonable. Moreno-Espada, 666 F.3d at 64. Thus, appellate counsel was not ineffective for failing to raise an ineffective assistance of counsel claim regarding trial counsel's use of the clothing evidence.

Petitioner next argues that trial counsel should have challenged the DNA evidence through a Daubert/Lanigan hearing in an effort to exclude the DNA evidence as unreliable. See

[ECF No. 25 at 41–46]; Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 584–87 (1993); Commonwealth v. Lanigan, 641 N.E.2d 1342, 1349–50 (Mass. 1994). But, as the trial judge explained, even if trial counsel had challenged the DNA evidence through a Daubert/Lanigan hearing, the DNA evidence would have not been excluded. See [ECF No. 1-3 at 9]. At best, Petitioner's arguments go to the weight of the DNA evidence rather than to its admissibility, and, at trial, Petitioner's counsel attacked the weight of the DNA evidence with expert testimony. See [id.].[11]

Finally, Petitioner asserts that his appellate counsel was ineffective by not raising a claim of ineffective assistance of counsel regarding trial counsel's failure to object to the prosecutor's statements about the DNA evidence at trial. [ECF 1-2 at 9]. Both the trial judge and the SJC found that the prosecutor's statements about the DNA evidence were either accurate statements of the evidence or reasonable inferences drawn from the evidence. See [ECF No. 1-3 at 9]; Issa, 992 N.E.2d at 354. The SJC also found that any possible issues with the characterization of the evidence were cured by the judge's instructions to the jury. Issa, 992 N.E.2d at 354. Petitioner cannot show that trial counsel was unreasonable in not challenging the statements, or that the outcome of the trial was likely to have been different but for trial counsel's failure to challenge the statements. Therefore, Petitioner's appellate counsel was not ineffective in failing to raise the above ineffective assistance of counsel claims, and Petitioner is not entitled to relief on Ground Six.

---

[11] Petitioner also argues that his appellate counsel was ineffective by failing to raise a claim of ineffective assistance of counsel regarding trial counsel's failure to challenge the scientific reliability of DNA test results through a Daubert/Lanigan hearing. [ECF No 1 at 10; ECF No. 1-2 at 6]. Given the Court's determination that Petitioner does not have a meritorious ineffective assistance of counsel claim with respect to his trial counsel, appellate council's decision not to raise an ineffective assistance of counsel claim regarding trial counsel's challenge of the DNA evidence also does not constitute ineffective assistance of counsel.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Yacouba-Issa's Petition for a Writ of Habeas Corpus is DENIED.  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to" a habeas petitioner.  Rules Governing Section 2254 Cases, R. 11(a).  The Court will issue a certificate of appealability in this instance so that Petitioner may appeal this Court's determination that the jury empanelment process did not violate Petitioner's constitutional rights.  See Batson, 476 U.S. 79.

**SO ORDERED.**

Dated: March 25, 2019

/s/ Allison D.  Burroughs
ALLISON D.  BURROUGHS
DISTRICT JUDGE